UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MOHEB FALTAS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 18-cv-10420-DJC |
| MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                   **March 30, 2021**

**I.     Introduction**

Plaintiff Moheb Faltas ("Faltas") filed this lawsuit against Defendant Massachusetts Department of Children and Families ("DCF") alleging violations of Title VII, 42 U.S.C. § 2000e *et seq.*, for hostile work environment (Count I) and retaliatory termination (Count II).  D. 1.  DCF has moved for summary judgment.  D. 36.  For the reasons stated below, the Court ALLOWS the motion.

**II.    Standard of Review**

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a

genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III.   Factual Background

The following facts are drawn from the parties' submissions of material facts, D. 38; D. 45, and the parties' responses to same, D. 46; D. 51, and are undisputed unless otherwise noted.[1]

#### A.   Employment at DCF

On August 1, 2016, Faltas began working for DCF as a social worker in its Harbor Area office. D. 38 ¶ 2; D. 46 ¶ 2. Faltas, like all new DCF social workers, was as an at-will, probationary employee for a six-month period. D. 38 ¶¶ 4–5; D. 46 ¶¶ 4-5. Faltas reported to Liz Lockyer ("Lockyer") when he started. D. 38 ¶ 7; D. 46 ¶ 7. Lockyer provided training and supervision for

---

[1] Faltas disputes much of DCF's statement of material facts, D. 38, by asserting that facts supported by sworn affidavits of his former supervisors alone "could be appropriately rejected by a reasonable jury," and that the affiants may be biased given this litigation. See D. 46 at 3–6, 8–14, 17–19, 21–22, 24 (citing Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 151 (2000)). The First Circuit has "rejected" reading Reeves "as precluding summary judgment where the movant relies on the testimony of interested witnesses." LaFrenier v. Kinirey, 550 F.3d 166, 167–68 (1st Cir. 2008). Affidavits that contain relevant first-hand information, like the affidavits of Lockyer, Salmon and Fernandez-Castro, are competent to support summary judgment. See Velázquez-García v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir. 2007) (explaining that "whether a nonmovant's . . . affidavits might be self-serving is not dispositive"). Moreover, when opposing a motion for summary judgment, "[failure] to oppose facts set forth" in the statement of material facts by not pointing to the record means "those facts may be deemed admitted" in the court's discretion. Brown v. Corsini, 657 F. Supp. 2d 296, 300 n.4 (D. Mass. 2009) (citing Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003)); Local Rule 56.1. Accordingly, the Court deems these facts admitted.

Faltas, including weekly scheduled individual supervision meetings, monthly group supervision meetings with his unit, and near-daily informal discussions with Lockyer about his casework. D. 38 ¶¶ 11–13; D. 46 ¶¶ 11-13. Lockyer notified Faltas of available trainings, which he attended monthly. D. 38 ¶¶ 14–15; D. 46 ¶¶ 14-15. In addition to formal trainings, Faltas was given sample assessments and court reports, and was able to shadow his colleagues on home visits and in court. D. 38 ¶¶ 17–19; D. 46 ¶¶ 17-19.

### B. Work Performance Concerns

Lockyer raised concerns about Faltas' work performance beginning in late August 2016 to DCF Area Program Manager Sandra Salmon ("Salmon"). D. 38 ¶¶ 27–28; D. 46 ¶¶ 27-28. In September 2016, Salmon relayed Lockyer's concerns to DCF Area Director, Monica Fernandez-Castro ("Fernandez-Castro"). Id. Such concerns included Faltas struggling to remember the names of families he worked with, making repeated errors in case dictation and documentation even after correction, using the incorrect format for court documents resulting in documents needing to be re-done, failing to include crucial information in case assessments resulting in incomplete explanations of why a case should open or close, failing to use correct terminology in case dictation and court reports, and trouble accepting feedback. D. 38 ¶¶ 29–37; D. 46 ¶¶ 29-37. Co-workers complained about Faltas' behavior in the workplace, including that he failed to respect their time and knowledge and made inappropriate comments about gender. D. 38 ¶¶ 39–40; D. 46 ¶¶ 39-40.

In December 2016, Lockyer completed performance reviews for all the social workers she supervised, including Faltas. D. 38 ¶ 41; D. 46 ¶ 41. Lockyer evaluated Faltas on six primary job duties—written assessments of new cases, written service plans, client contact, case management, case reviews and case closing—and checked that he "Meets" each one, as opposed to "Excels" or

"Below." D. 39-15 at 2–5. Alongside those check boxes, Lockyer wrote that Faltas "missed crucial information" on written assessments, but "has worked on this and improved," that he "needs to work on recalling" the first and last names of clients, and that "work needed to be done" when identifying case needs upon opening a case and to "fully explain why the case can close." Id. Lockyer then wrote in a narrative evaluation ("Part B")[2] that Faltas was "always available to help out in a crisis situation . . . comes to supervision prepared . . . and is good at updating [Lockyer]" but identified three areas of "continuous learning [:] focus on recalling family member names and unit member names . . . focus on proper words in dictation, court reports, Service Plans, etc. . . . adhere to [approved] formats." Id. at 6. Lockyer reviewed the evaluation with Faltas, but he declined to sign it or submit any comments in response, choosing instead to discuss the evaluation with Salmon. D. 38 ¶¶ 51–53; D. 46 ¶¶ 51-53. Faltas emailed Salmon on December 8, 2016 raising concerns about Lockyer's evaluation and supervision of him. D. 39-18 at 2.

On December 9, 2016, Fernandez-Castro met with Faltas where she issued him a written warning based on reports to her regarding his work performance and office behavior, which was described as unprofessional and inappropriate. D. 38 ¶¶ 57–63; D. 46 ¶¶ 57-63; D. 39-3 ¶¶ 11–12. Fernandez-Castro stated that if Faltas did not improve on these issues, she would terminate his probationary employment. D. 38 ¶ 58; D. 46 ¶ 58.

---

[2] Faltas disputes Part B of his evaluation, D. 39-15, by asserting that it was "added after his termination and he saw it for the first time in this litigation." D. 46 at 7–8. Faltas cites to "Ex, XX (Faltas aff.)," id. ¶ 42, but Faltas has not filed an affidavit or an Exhibit XX, nor does he point to any other record evidence to dispute when Part B was written and reviewed with him. Lockyer signed and dated Part B on December 2, 2016 and indicated in a hand-written addendum on December 6, 2016 that she reviewed it "in person with [Faltas] in supervision on 12/2/16." D. 39-15 at 6. Faltas admits that Lockyer reviewed the evaluation with him and that Lockyer's hand-written addendum was accurate. D. 46 ¶ 51. Accordingly, as to this record, there is no factual basis for the alleged dispute about the timing of Part B of the evaluation, D. 39-15.

On December 12, 2016, Dina Calixto ("Calixto") became Faltas' immediate supervisor when Lockyer transferred to another DCF office. D. 38 ¶ 64; D. 46 ¶ 64. Calixto raised similar concerns about Faltas' work to Fernandez-Castro, including that he struggled gathering information for his assessments, made repeated errors in documents after being corrected on such errors, failed to regularly inform Calixto of his whereabouts during work hours, and failed to respect the personal boundaries of his colleagues. D. 38 ¶¶ 65–70; D. 46 ¶¶ 65-70; D. 39-16 at 7. On January 6, 2017, Calixto emailed Faltas with specific feedback on case assessments, noting that he was not incorporating previous edits and suggestions Calixto had made. D. 39-25 at 2. The same day, Calixto emailed Myrielle Cesar ("Cesar"), her supervisor, with specific experiences from working with Faltas, including that she could not approve several of his case assessments due to incomplete information or errors in the assessments, and that on multiple occasions, Faltas was not present in the office on days he was scheduled to be there but did not inform her of his location. D. 39-26 at 2. On January 12, 2017, Cesar summarized these concerns in an e-mail to Fernandez-Castro, concluding that Calixto observed the same issues with Faltas' work performance as Lockyer previously had. D. 39-9 at 2; D. 46 at 11–12.

C. **Relations with Lockyer and Other Employees**

Around September 28, 2016, Faltas missed a client phone call due to the time difference in the client's location. D. 38 ¶ 93–95; D. 46 ¶¶ 93-95. The parties dispute whether Lockyer's response to the mistake was rude, where Faltas alleges that Lockyer said, "you do not listen, you do not understand," but Lockyer denies such comment was made at all, or that it was made loudly in front of Faltas' coworkers. Id.; D. 51 at 2. Faltas also claims that another social worker in the unit made similar comments about him not listening or understanding, but that no further comments of this nature were made to him. D. 38 ¶¶ 96–98; D. 46 ¶¶ 96-98. Lockyer also told

5

Faltas during a supervision meeting on September 30, 2016, where he sought to discuss the September 28 comment, that she was "not his therapist," but the parties dispute the intent and tone of this comment. D. 38 ¶ 99–104; D. 46 ¶¶ 99-104. Lockyer also heard from Faltas' coworkers that, while he was temporarily using the desk of another employee who was out on leave, he had gone through the desk drawers. D. 38 ¶¶ 105–09; D. 46 ¶¶ 105-09. Faltas admitted that he opened the drawers while using the desk but that he did not go through any personal items, and the parties dispute whether Lockyer mentioned the issue to Faltas. Id. ¶ 107. Salmon assured Faltas that he did not need to worry about the desk issue, and there was no mention of it in his evaluation, written warning, or termination letter. Id. ¶ 109.

On October 5, 2016, Faltas met with Salmon regarding Lockyer's comments to him, and Salmon listened to Faltas' concerns, thanked him for raising them, and told him she would investigate the matter further. D. 38 ¶¶ 115–18; D. 46 ¶¶ 115-18. Salmon spoke with other DCF employees who witnessed Lockyer's comment about the missed client call, then Salmon and Fernandez-Castro met with Lockyer to discuss Faltas' complaint regarding the comment. D. 38 ¶¶ 120–22; D. 46 ¶¶ 120-22. Lockyer apologized to Faltas at their next supervision meeting. D. 38 ¶ 125; D. 46 ¶ 125. Faltas emailed Salmon in December 2016 following Lockyer's evaluation of his work, which Salmon passed along to Fernandez-Castro. D. 38 ¶¶ 130–32; D. 46 ¶¶ 130-32. Salmon also told Fernandez-Castro that she agreed with Lockyer's comments on Faltas' evaluation. Id.

### D.     Termination from DCF

On January 17, 2017, Fernandez-Castro met with Faltas and his union representative where she informed him that she would not be recommending him for continued employment beyond his six-month probationary period, and Faltas could either resign by noon the following day or be

terminated.  D. 38 ¶¶ 84–86; D. 46 ¶¶ 84-86.  After Faltas did not resign, Fernandez-Castro terminated his employment.  D. 38 ¶¶ 87–89; D. 46 ¶¶ 87-89; D. 39-10.  The same day, Calixto informed Fernandez-Castro that she overheard a phone conversation in the shared DCF kitchen where Faltas stated that he owned a gun.  D. 38 ¶¶ 145–47; D. 46 ¶¶ 145-47.  DCF requested a police detail for its Harbor and Dorchester offices.  D. 39-13; D. 39-14.  On January 18, 2017, Faltas filed a formal complaint with the Massachusetts Commission Against Discrimination and delivered a copy of the complaint to his union vice president at DCF's Dorchester office.  D. 45 ¶ 31–33; D. 51 at 7.  There, Faltas was questioned by a police officer, searched and escorted out of the office.  Id.

### IV. Procedural History

Faltas initiated this lawsuit on March 5, 2018.  D. 1.  DCF moved to dismiss Faltas' state law claims (Counts I–VI), D. 8, which the Court allowed.  D. 15.  DCF now has moved for summary judgment on the remaining federal claims for Title VII discrimination and retaliation (Counts I and II).  D. 36.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 55.

### V. Discussion

#### A. **Termination Motivated by Unlawful Bias**

At oral argument, Faltas indicated he was no longer pressing a hostile work environment theory of liability as alleged in his complaint (Count I), but rather that "his termination was caused at least in part by unlawful bias" on account of his national origin, a mixed motive theory of liability proposed for the first time in his memorandum in opposition to summary judgment.  D. 43 at 8 (citing Burns v. Johnson, 829 F. 3d 1, 20 (1st Cir. 2016)).  Wrongful termination based on national origin was not pleaded in his complaint, rather he alleged a hostile work environment, see

D. 1 at 19 (pleading elements of hostile work environment claim) and that his termination was in retaliation for complaining about the alleged hostile work environment, see id. at 19–21 (pleading elements of retaliatory termination). Faltas cannot raise a new theory of liability at this stage. Roberts v. Crowley, 538 F. Supp. 2d 413, 417 (D. Mass. 2008); Grol v. Safelite Grp., Inc., 297 F. Supp. 3d 241, 246 (D. Mass. 2018) (citing Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006)). Even if this claim is properly raised now, it does not survive DCF's motion for summary judgment because Faltas has not identified a disputed issue of fact "to show that [Fernandez-Castro] relied 'at least in part' on racial bias or animus" when she terminated him. Brandt v. Fitzpatrick, 957 F.3d 67, 79 (1st Cir. 2020) (quoting Burns, 829 F.3d at 12). Although Faltas asserts he was "branded" with "anti-Arab or Middle Eastern stereotypes," D. 43 at 10, he has not put forth any evidence that these allegations, even if true, influenced Fernandez-Castro's decision to terminate him in addition to the reports of multiple employees highlighting deficiencies in his work performance and office behavior. See D. 38 ¶ 83. The work performance evaluations and other employee reports do not contain any of the stereotype-laden language Faltas claims. See D. 39-8; D. 39-9; D. 39-15; D. 39-19; D. 39-25; D. 39-26. Faltas further admits that no comments were ever made about his ethnicity or nationality. D. 38 ¶¶ 136–42; D. 46 ¶¶ 136-42. While such claims often rely upon circumstantial evidence (i.e., no explicit reference to membership in a protected class), there is no such evidence in the record from which to infer that he was terminated (even in part) because of his national origin, particularly where, as discussed below, Fernandez-Castro was the decisionmaker. Cf. Chadwick v. WellPoint, Inc., 561 F.3d 38, 46–48 (1st Cir. 2009) (citing Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir. 1999) (relying on circumstantial evidence and reasoning that employer's comment about a mother's two young children being burdensome,

which was made shortly before plaintiff was denied promotion, raised inference of sex stereotyping even though comment was not explicitly about plaintiff's sex).

Accordingly, to the extent that Faltas raises this claim now, it does not survive DCF's motion for summary judgment.

### B.    Hostile Work Environment (Count I)

As initially alleged, Faltas contends that he was the "target of . . . discrimination and a hostile work environment" based on his national origin, where Faltas is from Egypt.  D. 1 ¶ 146. "A hostile work environment exists in violation of Title VII '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  To succeed on a hostile workplace environment claim, Faltas must show:  "(1) that [he] is a member of a protected class;³ (2) that [he] was subjected to unwelcome harassment; (3) that the harassment was based on [his] membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of [his] employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)).

---

³ The parties do not dispute that Faltas is a member of a protected class as Egyptian or of Middle Eastern descent.  See D. 37; Koseris, 331 F.3d at 212.

DCF first asserts that Faltas has not shown that the alleged harassment was because of his national origin. D. 37 at 5. To be cognizable under Title VII, the alleged harassment underlying Faltas' hostile work environment claim must be because of his national origin. See Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007); Burns v. Potter, 334 F. Supp. 2d 13, 19–20 (D. Mass. 2004) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80–81 (1998)). Here, the alleged harassment began with two comments from Lockyer: first, that Faltas did not listen or understand her (though the parties dispute such comment was made), and second that she was not his therapist. D. 43 at 10. The undisputed record shows that Faltas missed a client call and Lockyer reprimanded him for it. D. 38 ¶ 93–95; D. 46 ¶¶ 93-95. In other words, while Lockyer may have used harsh language, it was tied to Faltas' failure to complete a required task and there is no evidence proffered of a connection to Faltas' national origin. See Kosereis, 331 F.3d at 217 (affirming that there was no hostile work environment when plaintiff received frequent reprimands for missing work and "could have simply arrived at work on time").

Faltas also suggests that he was excessively monitored by supervisors and harshly reviewed, motivated by or consisting of anti-Middle Eastern stereotypes. D. 43 at 10–11. The undisputed record suggests otherwise. First, Faltas was a probationary employee, warranting close review of his work. D. 38 ¶¶ 4–5, 8, 23; D. 46 ¶¶ 4-5, 8, 23. But there is also no evidence that Faltas received more frequent or harsh review than other employees. Second, his reviews from two supervisors, Lockyer and Calixto, were substantive and detailed, focusing on specific instances where Faltas needed to improve his work, like remembering the names of his clients, including relevant details in his case reports, and proofreading his written work before submitting it for approval to catch both typos and incorrect terms. See D. 39-9; D. 39-15; D. 39-16; D. 39-25; D. 39-26. Third, allegations from coworkers that Faltas had gone through the desk drawers of

10

a coworker's space he was temporarily using were confirmed in part by Faltas admittedly opening the drawers while using the desk, and such allegations did not appear in his review. D. 39-2 at 42; D. 38 ¶¶ 105–09; D. 46 ¶¶ 105-09. There is no other evidence to suggest that such allegations were tied to his national origin. Fourth, to the extent Faltas received a formal warning about his office behavior, Faltas offers no other evidence tying the warning to his national origin. D. 39-2 at 75–76; D. 39-5 at 4. Finally, to the extent Faltas felt excessively monitored for failure to post his whereabouts, he offers nothing to counter that Harbor office practice was for all social workers to post a schedule of their whereabouts and to be present in the office on their duty days, which he concedes he did not do on several occasions. D. 39-9; D. 38 ¶¶ 77–82. For all these reasons, "even assuming that the complained of conduct occurred, there is no evidence linking the actions to any protected status." Bangura v. Shulkin, 334 F. Supp. 3d 443, 464 (D. Mass. 2018) (citing Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 318 (1st Cir. 2016) (affirming summary judgment in favor of employer where no evidence that plaintiff was subjected to any of the complained of actions because of his race, other than plaintiff's own belief)).

Second, DCF asserts that Faltas' alleged harassment was not severe or pervasive. D. 37 at 7–8. Looking at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," the Court agrees. Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 471–72 (1st Cir. 2002) (quoting Harris, 510 U.S. at 22). Harassment is only "severe" if the act is physically threatening or humiliating, rather than a merely offensive utterance, and "pervasive" means more than occasional. See Harris, 510 U.S. at 23. Here, Faltas complains of only a handful of incidents, primarily Lockyer's comments and his performance review. Faltas highlights only one other comment from Lockyer—that she was not

11

his therapist—then admits that she apologized and ceased to make further comments he considered offensive. D. 46 at 17; cf. Bhatti v. Trustees of Bos. Univ., 659 F.3d 64, 74 (1st Cir. 2011) (affirming that showing "a litany of petty insults, vindictive behavior, and angry recriminations" are not actionable as a hostile workplace when objectively, workplace "crossed the boundary from professional to unprofessional" but fell short of being abusive); Vega-Colon v. Wyeth Pharm., 625 F.3d 22, 32 (1st Cir. 2010) (affirming that "very limited number of comments, along with more frequent name calling" even if subjectively offensive were not "objectively offensive conduct as the behavior was not severe, physically threatening, or humiliating"). The other conduct involves Faltas' performance reviews and his formal warning. On this undisputed record, it cannot be said that these interactions were objectively offensive. See Douglas v. J.C. Penney Co., 422 F. Supp. 2d 260, 280 (D. Mass. 2006), aff'd, 474 F.3d 10 (1st Cir. 2007) (noting that "poor performance reviews" and isolated incidents do not rise to hostile work environment); Thomas, 183 F.3d at 6 (distinguishing performance reviews where "reasonable to infer that race played a determinative role in the evaluation process" from "plaintiff who merely 'disagree[s] with [the employer's] assessment of her relative performance'") (citation omitted). Finally, Faltas has not shown any evidence that the conduct affected his work performance; to the contrary, he maintains that his work was adequate, and his termination was based on retaliation for complaining about his mistreatment. D. 43 at 13; see Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003) (affirming summary judgment where "complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [plaintiff's] work performance").

Third, DCF argues there is no basis for employer liability because Lockyer, who is alleged to have created the hostile work environment through her comments and evaluation, did not have unilateral authority to "hire, fire, demote, transfer, or discipline" Faltas, therefore, she was not legally a "supervisor for purposes of this claim." D. 37 at 9.  DCF's liability depends in part on whether Lockyer is legally Faltas' "supervisor." See Vance v. Ball State Univ., 570 U.S. 421, 424 (2013) (holding that if "the harasser is a 'supervisor' [and] the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable [but otherwise] the employer is liable only if it was negligent in controlling working conditions").  The First Circuit requires a supervisor, regardless of their job title, to have "actual authority [which] primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." Velazquez-Perez v. Devs. Diversified Realty Corp., 753 F.3d 265, 271 (1st Cir. 2014) (quoting Noviello v. Boston, 398 F.3d 76, 95–96 (1st Cir. 2005).  Here, Lockyer did not have such actual authority; Fernandez-Castro did, and between them were further layers of seniority.  D. 38 ¶¶ 9, 27, 83; D. 46 ¶¶ 9, 27, 83.  While Lockyer's evaluations helped form a basis for Faltas' termination, there is no evidence that Lockyer could have made that decision on her own, nor that she did.  Lockyer was, therefore, not Faltas' "supervisor" for purposes of the hostile work environment claim, so DCF is liable only if the alleged harassment was caused by DCF's negligence.  See Kathuria v. Dental Dreams LLC, No. 17-cv-30077-MGM, 2020 WL 3719507, at *7–8 (D. Mass. Jan. 8, 2020) (citing Velazquez-Perez, 753 F.3d at 272–73) (concluding that an employee who reported misconduct and provided advice and feedback regarding the plaintiff's employment status was nevertheless not a supervisor in a hostile work environment claim, even when termination was based in part on information from employee and applying negligence standard to claim).

DCF knew about Faltas' concerns with Lockyer. D. 38 ¶¶ 115–23; D. 46 ¶¶ 115-23. Liability, however, "only attaches if the employer, after receiving notice, fails to take prompt and appropriate ameliorative action [and] summary judgment will lie when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate." Wilson v. Moulison N. Corp., 639 F.3d 1, 8 (1st Cir. 2011) (citation omitted). Here, it is undisputed that Salmon met with Faltas the day he made his complaint about Lockyer, interviewed employees, raised the issue to Fernandez-Castro, and met with Lockyer. D. 38 ¶¶ 115–23; D. 46 ¶¶ 115-23. After the meeting, and despite Lockyer denying Faltas' allegations, she apologized, and no further comments were reported. D. 38 ¶¶ 125–27; D. 46 ¶¶ 125-27. Regarding Lockyer's evaluation, Salmon again acted promptly to elevate Faltas' concerns to Fernandez-Castro, who met with both Lockyer and Salmon to discuss the evaluation, and then with Faltas and his union representative. D. 39-3 at 7. Fernandez-Castro determined after this investigation that the review had merit. Id. DCF's same-day response was undoubtedly swift, Wilson, 639 F.3d at 8 (noting immediate response satisfied standard), and was also appropriate, insofar as the alleged conduct ceased and Lockyer promptly apologized to Faltas. Id. at 9 (explaining that "reasoned application of progressive discipline" in clear cases of harassment starting with a verbal warning, "will ordinarily constitute an appropriate response to most instances of employee misconduct"). As the Court explained above, the alleged harassment was neither severe nor pervasive, therefore prompt discussion, investigation and apology was an appropriate response. Id. at 8 (ending liability inquiry when, "given the totality of the circumstances, the punishment seems to have fit the crime"). Faltas, therefore, has not shown DCF is liable for the alleged hostile work environment.

Accordingly, to the extent that Faltas even presses the claim now, the Court allows DCF's motion for summary judgment as to Count I, the hostile work environment claim.

### C. Retaliation (Count II)

Faltas asserts that he was subjected to disciplinary warnings and ultimately terminated in retaliation for making complaints about Lockyer to DCF leadership. D. 43 at 14. "To show retaliation, [Faltas] has to prove that he complained about discrimination (or otherwise undertook protected conduct) and his employer took a material adverse action against him because of it." Brandt, 957 F.3d at 81 (citation and quotations omitted). Retaliation claims follow the McDonnell Douglas burden-shifting framework: "[o]nce the plaintiff makes out this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions, and if it does, the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation." Id. (citation and quotations omitted). Retaliation claims require a showing of "but-for" causation; here, that Faltas "'would not have been terminated in the absence of the' protected complaints." Roy v. Correct Care Sols., LLC, 914 F.3d 52, 70–71 (1st Cir. 2019) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

Faltas cannot satisfy the prima facie case for retaliation because, even assuming his complaints were protected conduct, he has not shown such complaints were the but-for cause of his termination.[4] To the contrary, Fernandez-Castro considered the reviews and comments of Lockyer, Calixto, Salmon and Cesar, as well as her own interactions with Faltas upon issuing a formal warning. See D. 38 ¶ 83; D. 46 ¶ 83. Aside from Faltas' own supposition about DCF's

---

[4] Faltas also argues that DCF retaliated against him by requesting police details on the days surrounding his termination. D. 1 at 20; D. 43 at 11. Like the termination itself, Faltas cannot show that his complaints about Lockyer were the but-for cause of the security request. Here, the undisputed record as to DCF shows that it requested the details because of Faltas' comment about having a license to carry a gun. D. 39-13; D. 39-14.

ulterior motives, D. 43 at 13, there is nothing in these reviews that ties them to his complaints about Lockyer. See D. 39-8; D. 39-9; D. 39-15; D. 39-19; D. 39-25; D. 39-26. Even putting aside reports of other Harbor coworkers about Faltas' office behavior, the formal and informal performance reviews show how Faltas continued to make the same errors in his work over the course of his probationary employment and did not follow office protocol on posting a schedule of his location. See id. Fernandez-Castro stated this as grounds for his termination. D. 39-3 at 5; see Ponte v. Steelcase Inc., 741 F.3d 310, 322–23 (1st Cir. 2014) (affirming that plaintiff failed to make prima facie case of retaliatory termination when termination based on performance reviews that began before the alleged harassment, came from multiple sources at company, and deficient performance was partially admitted to by plaintiff). Moreover, Faltas' causation showing suffers from the fact that Lockyer began to raise concerns with Salmon about Faltas' work performance in late August, and Salmon then discussed these performance concerns with Fernandez-Castro in early September, all before the harassment alleged by Faltas began on September 28, 2016, and complaints about same, on October 5, 2016. D. 38 ¶¶ 27, 93, 115–17; D. 39-3 at 3; see Ponte, 741 F.3d at 322 (denying retaliation claim in part because "performance problems began before the harassing incidents took place"); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012) (noting that "courts typically look to the time between protected activity and retaliation" and citing cases where causation inferred from time between protected conduct and adverse employment action); Walker v. City of Holyoke, 523 F. Supp. 2d 86, 112 (D. Mass. 2007) (finding "[p]laintiff's suspension was unrelated to her [protected activity]" in part because "even before filing her complaint in March 2005, [plaintiff] had established a track record of reprimands and suspensions, along with a final warning in November 2004 that she was facing the possibility of termination").

Accordingly, on this record, the Court allows summary judgment to DCF on Count II, the retaliation claim.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS DCF's motion for summary judgment, D. 36.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge